# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>     Appellee,<br><br>  -against-<br><br>JASON GALANIS, GARY HIRST,<br>JOHN GALANIS, a/k/a "Yanni,"<br>HUGH DUNKERLEY, MICHELLE<br>MORTON,<br><br>     Defendants,<br><br>DEVON ARCHER, BEVAN<br>COONEY,<br><br>     Defendants-<br>     Appellants. | Nos. 17-346, 17-348 |
| IN RE: DEVON ARCHER,<br><br>     Petitioner. | No. 17-353 |

## DEVON ARCHER'S REPLY IN FURTHER SUPPORT OF HIS EMERGENCY MOTION FOR STAY PENDING APPEAL AND PETITION FOR WRIT OF MANDAMUS, AND OPPOSITION TO THE GOVERNMENT'S MOTION TO DISMISS

# PRELIMINARY STATEMENT[1]

Contrary to its arguments before the District Court, the government – confronted with its own recent representations to this Court – now concedes that "motions to quash are valid vehicles to challenge search warrants for digital evidence pursuant to the Stored Communications Act," and that "motions to quash [search warrants] are cognizable and can be adjudicated by a district court." Opp. ¶ 29.[2] That concession resolves this appeal, because all that Mr. Archer seeks is to have his motion to quash heard by the District Court.

In the court below, however, the government argued that such a motion would be "unprecedented." The District Court accepted the government's incorrect representation, and refused to allow Mr. Archer

---

[1] Just as the government did in its combined (1) opposition to Mr. Archer's motion for a stay pending appeal, (2) opposition to his petition for a writ of mandamus, and (3) motion to dismiss for lack of jurisdiction, Mr. Archer is addressing matters related to both motions and his petition in a single filing, which is being filed under docket numbers 17-346 and 17-353.

[2] Citations to "Opp." refer to the Affirmation of Brian R. Blais, dated February 10, 2017. Citations to "Mot." refer to Mr. Archer's February 6, 2017 motion for a stay pending appeal and petition for a writ of mandamus. Citations to "Ex." refer to exhibits to the Declaration of Matthew L. Schwartz, dated February 6, 2017.

to make the motion, holding that it was "not prepared to adopt" a precedent that would "allow a potential pre-execution motion" to quash. Ex. B, at 18. The government's concession that such motions are not unprecedented, but rather are "valid vehicles," knocks the props out from the rationale that the District Court adopted and assures Mr. Archer's success on the merits of this appeal. Given that certainty, and the irreparable injury Mr. Archer will suffer absent a stay, the Court should grant the requested relief. Indeed, on the basis of the government's concession, the Court should summarily reverse and remand with instructions to allow Mr. Archer to bring his motion.

## ARGUMENT

### I.    The District Court's January 31, 2017 Order Should Be Stayed Pending Appeal

#### A.    Mr. Archer Is Likely To Succeed On The Merits Of His Appeal

The District Court refused to permit Mr. Archer to make a motion to quash two search warrants obtained by the government under the Stored Communications Act. The government now admits that such motions are "valid vehicles to challenge search warrants for digital evidence pursuant to the Stored Communications Act," and that "motions to quash [search warrants] are cognizable and can be

adjudicated by a district court." Opp. ¶ 29.  That concession fully resolves

this appeal, because Mr. Archer cannot be prevented from making

permissible motions.  *See In re Best Payphones, Inc.*, 450 F. App'x 8, 15

(2d Cir. 2011) ("a court may not deny a party the opportunity to file even

a frivolous motion"); *see also*, *e.g.*, *Richardson Greenshields Securities v.

Lau*, 825 F.2d 647, 649, 652 (2nd Cir. 1987) ("We believe that the

district judge usurped her power when she prevented the Laus from

filing a motion for leave to amend their answer.  Absent extraordinary

circumstances . . . a court has no power to prevent a party from filing

pleadings, motions or appeals authorized by the Federal Rules of Civil

Procedure."); *In re Sch. Asbestos Litig.*, 977 F.2d 764, 793 (3d Cir. 1992)

(a district court's refusal "to consider the merits of a summary judgment

motion is a failure to exercise its authority when it has the duty to do

so").

Unable to resist this conclusion or argue that Mr. Archer should

not be permitted to make his motion, the government attempts to recast

Mr. Archer's appeal, and then argues against that straw man.[3]   Even so, none of its arguments have merit.

### 1. Mr. Archer Can Not Be Prohibited From Filing A "Valid" and "Cognizable" Motion

The government's first argument fails because it proceeds from the assumption that Mr. Archer can be prohibited from making a valid motion.  But the government concedes that a pre-execution motion to quash a Stored Communications Act warrant is "valid" and "cognizable."  Opp. ¶ 29.  That being so, Mr. Archer is entitled to move to quash the warrants.

The District Court refused to allow Mr. Archer to make a motion to quash based on what it perceived (and the government represented) to be a lack of precedent for such motions.  *See* Ex. B, at 18.  As Mr. Archer pointed out in his initial papers in this Court, however, and as the government is now forced to concede, there is such precedent, and the government itself has recently urged in this Court that motions

---

[3]     In addition to the arguments discussed in this section, the government also argues that this Court lacks jurisdiction over Mr. Archer's appeal.  This argument is addressed at Point II, below, in the context of the government's motion to dismiss.

to quash are an appropriate way to challenge Stored Communications Act warrants.

If the government means to argue that there is no precedent requiring a court to allow Mr. Archer to make a motion that is procedurally appropriate, it is mistaken. To the contrary, this Court has repeatedly held that a court must allow a litigant to make procedurally appropriate motions. *See Best Payphones*, 450 F. App'x at 15; *Richardson*, 825 F.2d at 649, 652; *Grace Lines, Inc. v. Motley*, 439 F.2d 1028, 1030-31 (2d Cir. 1971). The burden is not on Mr. Archer to point to authority requiring the District Court to allow him to move to quash; it is on the government to point to any authority that would permit the Court to forbid it.

That being said, the relief that Mr. Archer requests is not nearly as broad as the government imagines. The Court need not set a rule that litigants are allowed to stay execution of all search warrants while they move to quash. But in the narrow class of cases in which the government (1) obtains a warrant under the Stored Communication Act, which requires service providers to make a copy of the requested data, ensuring that the government will not be prejudiced by motion practice,

and (2) does not obtain a sealing or non-disclosure order, therefore recognizing that the investigation will not be prejudiced by notice to the account-holder, a motion to quash is perfectly appropriate. Indeed, as noted in Mr. Archer's moving papers, every grand jury subpoena – a far more common investigative tool – is subject to a potential motion to quash, but that has not stopped the government from using them widely.[4]

Prior to filing its opposition in this Court, the government strenuously argued that pre-execution motions to quash were never appropriate under any circumstances – essentially, that there is no such thing as a motion to quash a search warrant. *See, e.g.,* District Court ECF No. 130 at 3 ("The defendant . . . seeks the unprecedented ability to challenge the search warrant before the Government searches the data."); *id.* (referring to Mr. Archer's "novel attempt to quash the execution" of the search warrants); *id.* at 4 ("There is simply no

---

[4]     The government's only response to this fact is a non sequitur, pointing out that warrants require the approval of a magistrate. Opp. ¶ 43 n.5. This has nothing to do with motions to quash, which are directed to the face of the subpoena and not to whether there was reasonable cause to issue them. *See generally United States v. Calandra*, 414 U.S. 338, 345-46 (1964).

justification for such an unprecedented result."). The District Court appeared to credit this argument, as its ruling leaves no room for any defendant to file a motion to quash a search warrant under any circumstances. A decision of such breadth is clearly erroneous, as the government has now been forced to admit. *See* Opp. ¶ 29.

In fact, Mr. Archer merely requested that the District Court find that, in this instance, it was appropriate to enter a brief stay of the execution of the Google warrant and the government's review of the Apptix materials in order to provide him with a meaningful opportunity to litigate a motion to quash before his attorney-client privileged communications were inevitably invaded, and his Constitutional rights violated. The District Court incorrectly held that it was incapable of even hearing such a motion. On those grounds alone, the District Court's Order is clearly erroneous. *See Best Payphones*, 450 F. App'x at 15; *Richardson*, 825 F.2d at 649, 652; *Grace Lines*, 439 F.2d at 1030-31.

### 2. Although Not Necessary On This Appeal, Mr. Archer Can Show That The Warrants Are Defective

The government also argues that a motion to quash the search warrants would be unlikely to succeed. *See* Opp. ¶ 30. Because the motion the denial of which is being challenged in this appeal did not seek to quash the warrants, however, Mr. Archer need not establish that he is likely to succeed on the merits of any motion to quash in order to prevail. Instead, what Mr. Archer sought in the District Court was simply to be heard on a motion to quash. He is therefore likely to succeed if the District Court should have entertained such a motion – a motion the government is now forced to admit is "cognizable." Opp. ¶ 29. For that reason, Mr. Archer never claimed to argue the merits of the motion to quash. *See* Mot. at 24 n.9. [5]

That being said, Mr. Archer *is* likely to succeed on the merits of any motion to quash the warrants. To begin with, for at least three

---

[5] Similarly, the discussion of the warrants' defects herein is by no means exhaustive, and by providing examples of those defects, Mr. Archer does not waive any other bases on which to challenge the warrants.

reasons, the government is incorrect in contending that the warrants are "sufficiently particularized and not overbroad." Opp. ¶ 32.

*First*, the warrants on their face permit the government to seize and search privileged communications. The warrant affidavit does little to dispel Mr. Archer's reasonable fears concerning the validity of the warrants. For example, the affidavit provides that law enforcement personnel (not limited to attorneys) intend to do an exacting, piece-by-piece, fine-tooth-comb review of the entire contents of the subject accounts. *See* Ex. E, ¶ 24; *see also id.* ¶ 22 (authority to search for "passwords or other information needed to access the user's computer or other online accounts" – neither of which are the subject of the warrants).

*Second*, the warrants are facially overbroad because they allow the government to collect any evidence of "crime." As the government acknowledges, "a warrant cannot, for example, call for the seizure of all 'records,' or all evidence 'relating to the commission of a crime.'" Opp. ¶ 30 (quoting *United States v. Bianco*, 998 F.3d 112, 116 (2d Cir. 1993)). But that is just what the warrants do here – a fact that the government

elides with selective quotations.  The warrants in this case authorize a search for:

> evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Section 1348, and Title 15, United States Code, Sections 78j(b) and 78ff, Title 17, Code of Federal Regulations, Sections 240.10b-5; conspiracy to commit securities fraud, in violation of Title 18, United States Code, Section 371; investment advisor fraud, in violation of Title 15, United States Code, Sections 80b-6 and 80b-17; and conspiracy to commit investment adviser fraud, in violation of Title 18, United States Code, Section 371, *among other statutes*, including the following:
>
>        *      *      *
>
> • *evidence of crime* (*e.g.*, agreement to engage in unlawful conduct, references to or discussion of unlawful conduct), *communications constituting crime* (*e.g.*, emails containing fraudulent representations). . . .

Ex. D, at ECF pgs. 6-7 (emphases added).  In arguing that the warrants are not overbroad, the government strategically omits the "among other statutes" language when it otherwise quotes the same text, *see* Opp. ¶ 32, and declines to mention the "evidence of crime" provision at all. But taken on their face, the warrants authorize a search for "evidence of crime," not limited to any underlying violations – instead, there is only

an example of which laws might be involved, "among other statutes."

By the government's own standards, these are overbroad and facially defective warrants.

*Third*, the warrants are overbroad because they allow the government to collect categories of evidence about which there has been no showing of probable cause. As the government puts it, "[a]s to each category of evidence identified for seizure in the warrant, there must exist probable cause to believe it is relevant to the investigation at issue." *Id.* ¶ 31. But the warrants in this case do not supply probable cause for "each category of evidence." For example, there is *nothing* in either warrant or the affidavit demonstrating that the gigabytes of non-email data associated with the Google account (including documents and photographs on Google Drive or Picasa Web Albums), or information associated with Google Payments, Google URL Shortener, Google Analytics, or Google Alerts would have any relevance to the charged crimes that would render them subject to seizure. The government's opposition does nothing to address these issues, which were raised in Mr. Archer's original motion. *See* Mot. at 26 & n.10.

The alleged probable cause for the warrants is also stale, as every one of the emails relied upon in the affidavit was sent more than two years before the warrants were obtained. The government tries to obscure this fact by arguing that the emails described in the affidavit are within the date range sought by the warrants. Opp. ¶ 34. But that is not relevant. As the government admits, the question is whether the evidence supporting probable cause "is not sufficiently close in time *to the issuance of the warrant*." *Id.* ¶ 35 (quoting *United States v. Raymonda*, 780 F.3d 105, 114 (2d Cir. 2015)) (emphasis added); *id.* (staleness decided with reference to "the time of the search"). This makes perfect sense, because the staleness inquiry is meant to ensure that before the government seizes property or violates privacy rights, there is probable cause to believe not only that a crime was committed once upon a time, but also that the evidence will still be there at "the time of the search." *United States v. Wagner*, 989 F.2d 69, 75 (2d Cir. 1993) ("While there is no bright line rule for staleness, the facts in an affidavit supporting a search warrant must be sufficiently close in time to the issuance of the warrant and the subsequent search conducted so

that probable cause can be said to exist as of the time of the search and not simply as of some time in the past.").

In this case, the "time of the search" is no sooner than December 28, 2016 – the day on which the government obtained the warrants – whereas the alleged probable cause is based on emails between February and October 2014, more than two years earlier. *See* Ex. E, ¶¶ 17.c, 19.a. Indeed, the alleged probable cause to search the Google account – not just emails, but Google Drive, Google Docs, and other unrelated documents – is based on a *single email*, dated September 26, 2014, on which the relevant Google account was cc'd. *See id.* ¶ 18 (sole reference in the affidavit to email involving the "ARCHER SENECA ACCOUNT"). That is, there is no allegation that any relevant communications were sent from the Google account associated with Mr. Archer. This single factual allegation – that the account was cc'd on one relevant communication in September 2014, 26 months prior to the issuance of the warrants – simply does not support the seizure of years' worth of data, going far beyond emails to various other categories of information about which there is no showing of probable cause. *See generally United States v. Reyes*, 922 F. Supp. 818, 827 (S.D.N.Y. 1996)

("while there is no bright line for defining staleness, the information necessary to support a finding of probable cause should be no older than one year"); *see also, e.g., United States v. Cordova*, 792 F.3d 1220, 1224 (10th Cir. 2015) (holding that evidence of single transaction 22 months prior to search was so insufficient to establish probable cause that evidence would be found in home that officers could not even rely on warrant in good faith).

In sum, though not an element of the stay analysis, Mr. Archer is likely to prevail not only on this appeal – which will allow him to make a motion to quash – but on the merits of *that* motion, as well.

## B. Mr. Archer Will Be Irreparably Injured Absent A Stay

Absent a stay, the government will be able to immediately begin reviewing thousands of communications protected by the attorney-client privilege, destroying the privilege in the process. This injury "is neither remote nor speculative," and is, in fact, "actual and imminent." *Shapiro v. Cadman Towers, Inc.*, 51 F.3d 328, 332 (2d Cir. 1995).

In arguing that any injury is speculative, the government misapprehends the way the privilege (and the Fourth and Sixth Amendments) work. The government argues that its proposed use of a

"taint team" to attempt to minimize the leakage of privileged material means that Mr. Archer's injury is not "actual and imminent." Opp. ¶¶ 22, 38-40. That argument – which presumes that the only harm to Mr. Archer would be the *use* of privileged materials at trial – is wrong as a matter of law.

Unlike the Fifth Amendment – which is violated only when a compelled statement is used against a defendant, and not when the statement is first compelled – violations of the Fourth and Sixth Amendments and the attorney-client privilege are complete at the moment of government action. *See*, *e.g.*, *Steagald v. United States*, 451 U.S. 204, 211 (1981) (finding Fourth Amendment violation at the moment of entry into a home). For example, the mere production of privileged materials to a third party is routinely held to destroy the privilege, regardless of whether those materials are ultimately put to any use. *See, e.g., In re Horowitz*, 482 F.2d 72, 81 (2d Cir. 1973). As a result, this Court has repeatedly held that violations of the privilege, and of a defendant's Fourth or Sixth Amendment rights, constitute irreparable injury. *See, e.g., Int'l Bus. Machines Corp. v. United States*, 493 F.2d 112, 128 (2d Cir. 1973) ("If IBM is coerced by the district

court's contempt order into delivering to the government the privileged documents, then Cravath surely will be irreparably injured."); *Covino v. Patrissi*, 967 F.2d 73, 77 (2d Cir. 1992) (Fourth Amendment violation constitutes "irreparable harm").

Moreover, the government's access to privileged materials (not to mention non-privileged materials that the government is not entitled to have given that the warrants are defective) threatens to permeate and taint this entire case, leading the government down investigatory roads that it would otherwise never have travelled absent its impermissible review of privileged communications. Neither the use of a "taint team" nor the government's stated willingness to consider Mr. Archer's views before finalizing its review protocol is sufficient to render the harm to Mr. Archer anything short of "actual and imminent." *Shapiro*, 51 F.3d at 332.

The government also contends that Mr. Archer's injury is speculative because it has not yet begun to review the materials sought by the warrants, including thousands of attorney-client privileged

documents.  Opp. ¶ 40.[6]  But it is undisputed that the government already has the Apptix documents, and Google appears ready to produce responsive documents if these appellate proceedings are resolved in the government's favor.  Absent a stay, then, Mr. Archer will not be able to forestall the government's review while he challenges the warrants.  In other words, the intervention of this Court is the only thing preventing Mr. Archer's attorney-client privilege from being invaded by the very same government authorities who are criminally prosecuting him.[7]  An injury sought to be avoided by a stay cannot be more "actual and imminent" than that.  *Shapiro*, 51 F.3d at 332.

The government also contends that Mr. Archer's "claimed injury" is rendered "speculative" by the fact that it "intends to implement measures, including the use of a taint team, to minimize the potential of

---

[6]    For purposes of this appeal, it is undisputed that the relevant accounts contain privileged material, *see* Opp. ¶ 41, which will be seized and reviewed by the government if it can execute the warrants.

[7]    There are other consequences to the government's review of all of the data in the Google and Apptix accounts, as well, which counsel in favor of permitting a motion to quash.  *See, e.g., United States v. Comprehensive Drug Testing, Inc.*, 621 F.3d 1162, 1176 (9th Cir. 2010) (en banc) ("Once a file is examined, however, the government may claim (as it did in this case) that its contents are in plain view.").

any such injury." Opp. ¶ 40. Contrary to how the government has interpreted his arguments, Mr. Archer has never argued that this Court "require[s] that specific search protocols be used in connection with a digital search," "that a specific search protocol [must] be delineated in a search warrant in order for the warrant to be valid," or "that the use of a 'taint team' to screen materials before they are produced to the prosecuting team invalidates an otherwise valid warrant." *Id.* ¶ 39.[8] Instead, what Mr. Archer has argued is, first, that the warrants contain absolutely no restrictions on the search of privileged communications, therefore authorizing the government to search such materials. Second, Mr. Archer argued that a so-called "taint team" represents an insufficient prophylactic against the kinds of injuries that will actually and imminently stem from the government being granted access to thousands of privileged communications – a fact that numerous courts

---

[8]     This Court has, however, left open the possibility that it may impose a requirement for such a protocol. *See United States v. Galpin*, 720 F.3d 436, 451 (2d Cir. 2013) ("[W]e have not required specific search protocols or minimization undertakings as basic predicates for upholding digital search warrants, and we do not impose any rigid requirements in that regard *at this juncture*.") (emphasis added).

have recognized.  *See* Mot. at 9-11.  Nothing in the government's brief at all undermines that argument.[9]

The government also claims that any injury resulting from it reviewing thousands of attorney-client communications would not be "irreparable":

> If Archer determines that the Government encountered privileged materials during its review of the email accounts . . . , he can seek suppression of those materials; he can seek a taint hearing, at which the nature of any taint is explored; and, in an extreme case, he can seek disqualification of any member of the Government team who encountered the privileged materials.

Opp. ¶ 40.  But this argument reveals the problem with the government's logic, as it depends on Mr. Archer "determin[ing] that the Government encountered privileged materials," figuring out precisely what privileged materials were "encountered," and then determining

---

[9]     The government also argues that because it is "willing[] to consider the views of [Mr. Archer's counsel] before finalizing the review protocol," any injury to Mr. Archer would not be "actual and imminent." Opp. ¶¶ 40-41.  But *no* review protocol that involves the government reviewing all potentially privileged materials and making determinations about what is or is not privileged will adequately protect Mr. Archer's attorney-client privileged communications.  *See* Mot. at 9-11.

how such "encounter[s]" directed or otherwise impacted the government's overall investigation or trial strategy.

Certainly, this will be an easy task as to any privileged materials that show up on the government's list of trial exhibits, all of which Mr. Archer can straightforwardly seek to suppress. But this is not simply a matter of "fight[ing] about whether or not something is admissible at trial when no one has even said they want to admit it at trial," as the government describes the present dispute. Ex. B, at 16. Indeed, as the government explicitly acknowledges, it intends on "taking further investigative steps based on information gleaned from the fruits" of the warrants, including identifying "witnesses, additional email accounts . . . to search, or telephone numbers as to which additional data could be obtained." Opp. ¶ 43.

This begs a very important question: How, exactly, is Mr. Archer supposed to adequately defend himself against the myriad risks posed by this more subtle and insidious form of taint, where access to privileged materials can change the tenor and/or direction of the government's investigation or trial strategy in ways that neither he nor anyone outside of the prosecution team could ever truly know?

Granting the government access to the thousands of privileged documents in the Google and Apptix accounts would open up every action that the government has taken or will take in this case to *Kastigar*-like evidentiary hearings, as the government is not entitled to premise its investigation or trial strategy on the violation of Mr. Archer's privilege, his Sixth Amendment rights, or his Fourth Amendment right to be free from the kind of unconstitutional general searches called for by the warrants. *See, e.g., In re Grand Jury Subpoenas*, 454 F.3d 511, 517 (6th Cir. 2006). Even with the availability of evidentiary hearings, the idea that Mr. Archer can adequately protect himself in the manner that the government suggests – via suppression, taint, and/or disqualification proceedings – while being completely blind to everything that has happened or will happen behind the government's investigatory curtain simply ignores the reality of how federal criminal investigations work.

Accordingly, Mr. Archer will be actually and imminently harmed by the denial of his motion for a stay pending appeal, and in ways that cannot be adequately addressed through any of the prophylactic or post-hoc measures identified by the government.

**C.     The Absence Of Any Prejudice To The Government And The Public Interest Both Counsel In Favor Of The Requested Stay**

The requested stay will not prejudice the government and will serve the public interest.  The government contends that a stay "will substantially delay" its review of materials from Google and Apptix, "and may thereby delay the trial of this matter as well."  Opp. ¶ 42. While a stay will, by its very nature, somewhat delay the government's review of materials responsive to the warrants, it will not cause a "substantial[] delay."  *Id.*  As part of his motion, Mr. Archer has moved for expedited consideration of this appeal, so that it may be heard "at the earliest practicable date."  Mot. at 26; *see also id.* at 12 n.5 (stating that, because "Mr. Archer has no desire to needlessly delay trial, . . . he respectfully requests expedited consideration of this appeal").  And there is little chance of a stay delaying trial of this matter, as no trial date has been set, and trial is not likely to take place for many months.

As Mr. Archer has stated, his interest is in returning to the District Court and moving to quash the warrants as soon as possible. *See id.* at 26.  Indeed, based on the government's concession that such a

motion is a "valid vehicle," this Court may reverse and remand right now, obviating any delay. Opp. ¶ 29.

The government also contends that litigating this appeal "may be a waste of judicial time and resources, as [it] has not at this point ascertained whether it intends to use any fruits" of the warrants at trial. *Id.* ¶ 42. As noted above, however, Mr. Archer's concerns are not limited to the introduction of evidence at trial. His concerns also include preserving the attorney-client privilege in the first place, regardless of the use (if any) to which the government puts his privileged communications. In addition, Mr. Archer has a valid concern about how the government's access to privileged material will impact its ongoing investigation and trial strategy, including in ways that he will have no real way of knowing, understanding, or challenging given the shroud of secrecy that cloaks government investigations.

The government underlines the importance of this concern when it argues that the requested stay "could prevent [it] from taking further investigative steps based on information gleaned from the fruits" of the warrants. *Id.* ¶ 43. Accordingly, Mr. Archer is threatened not only by the erroneous introduction of evidence at trial, he is also threatened

much more profoundly by the doors that will inevitably be opened by the government's improper review of such material – doors that, once opened, will be impossible to truly shut.

On this same point, the government also claims that additional investigative steps "could be impeded or rendered impossible with the passage of time." *Id.* But the government offers no basis for its rank speculation that a short stay would allow witnesses, email records, or phone records to somehow disappear or otherwise move beyond the government's reach – especially in light of the fact that this case was publicly charged more than six months ago.

The government also contends that "a ruling that would enable criminal defendants to delay the execution of post-indictment search warrants . . . would set a dangerous precedent." *Id.* But the government now acknowledges that a motion to quash a search warrant is "cognizable and can be adjudicated by a district court," and "that motions to quash are valid vehicles to challenge search warrants for digital evidence." Opp. ¶ 29. Accordingly, the only "precedent" that could arguably be set by a ruling in Mr. Archer's favor in this appeal is that an individual whose attorney-client privileged communications are

implicated by a search warrant, and who is legally and procedurally entitled to move to quash that search warrant, is also entitled to a brief stay of the execution of that search warrant in order to have a meaningful opportunity to litigate his or her motion to quash. *Id.* ¶ 43. There would be nothing "dangerous" about this Court setting such a precedent. *Id.* Indeed, finding otherwise would set a "dangerous precedent," as it would mean that, while an individual in a position like the one in which Mr. Archer finds himself has the right to challenge a search warrant prior to its execution, he or she is essentially handcuffed in his or her ability to meaningfully exercise that right. *Id.* As discussed above, however, this Court has repeatedly held to the contrary: Where a litigant has a valid motion to make, it is error not to allow him or her to do so. *See Best Payphones*, 450 F. App'x at 15; *Richardson*, 825 F.2d at 649, 652; *Grace Lines*, 439 F.2d at 1030-31.

Accordingly, entry of the requested stay will not prejudice the government at all, and will serve the public interest.

## II.    The Government's Motion To Dismiss Should Be Denied

This Court possesses jurisdiction over this appeal under any one of three independent bases.

## A. This Court Has Jurisdiction Over This Appeal Pursuant To 28 U.S.C. § 1291

Under the clear and undisturbed holding of *Perlman v. United States*, 247 U.S. 7 (1918), this Court has jurisdiction over Mr. Archer's appeal. *See* Mot. at 15-18. The government acknowledges that "[u]nder the *Perlman* doctrine, 'the holder of an asserted privilege may immediately appeal the enforcement of a subpoena when the subpoena is directed at another person who does not object to providing the testimony or documents at issue.'" Opp. ¶ 16 (quoting *In re Air Crash at Belle Harbor, N.Y. on Nov. 12, 2001*, 490 F.3d 99, 106 (2d Cir. 2007)). The government also acknowledges that "'[t]he theory of immediate appealability in these cases is that the third party will not be expected to risk a contempt citation and will surrender the documents sought, thereby letting the "cat out of the bag" and precluding effective appellate review at a later stage.'" *Id.* (quoting *In re Katz*, 623 F.2d 122, 124 (2d Cir. 1980)).

Under *Perlman*, as even the government describes it, Mr. Archer's appeal is therefore plainly proper. The government argues, however, that *Mohawk Industries, Inc. v. Carpenter*, 558 U.S. 100 (2009), casts doubt upon "the ongoing validity of the *Perlman* doctrine as a ground of

jurisdiction." Opp. ¶ 17. In support, the government cites a single circuit court holding "that in cases where a privilege holder is a party to the litigation and thus can vindicate his rights through an appeal from a final order, interlocutory jurisdiction under *Perlman* does not survive *Mohawk*," *id.* (citing *Holt-Orsted v. City of Dickson*, 641 F.3d 230, 238 (6th Cir. 2011)), and a handful of others that have suggested the same in *dicta*. The government also cites *United States v. Punn*, 737 F.3d 1, 11 n.8 (2d Cir. 2013), for the proposition that "[t]his Court has recognized the tension between *Perlman* and . . . *Mohawk*," *id.*, though that case merely stated that this Court "express[ed] no opinion as to whether" *Mohawk* affected *Perlman*.

Unfortunately for the government, it simply "cannot say that the Supreme Court has abandoned [the *Perlman* doctrine] on the basis of a later case, *Mohawk,* that never cites, let alone discusses, *Perlman*." *In re Grand Jury*, 705 F.3d 133, 146 (3d Cir. 2012) (concluding that the *Perlman* doctrine remains viable after *Mohawk*). The Supreme Court has repeatedly stated that its "decisions remain binding precedent until we see fit to reconsider them, regardless of whether subsequent cases have raised doubts about their continuing vitality." *Hohn v. United*

*States,* 524 U.S. 236, 252-53 (1998); *see also Rodriguez de Quijas v. Shearson/Am. Express, Inc.,* 490 U.S. 477, 484 (1989) ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.").[10]

Moreover, as the Third Circuit has noted in concluding that the *Perlman* doctrine survives *Mohawk*:

> Perlman himself sought to prevent the disclosure of documents to a grand jury that was conducting an investigation into whether he committed perjury in a patent infringement action. The Supreme Court has not subsequently suggested that Perlman's status as a grand jury subject would today deny him immediate appellate review and the *Mohawk* Court gave no clear indication that this was a consequence of its intended holding. It did not discuss, mention, or

---

[10] These principles have particular importance here, where this case is readily distinguishable from *Mohawk*. Besides the fact that *Mohawk* was a civil case, whereas this appeal and *Perlman* are both criminal cases, *Mohawk* involved a finding by the district court that "the privilege had been waived." Opp. ¶ 21 (discussing *Mohawk*). In this case, however, Mr. Archer has explicitly not waived any privilege, whereas the government's execution of the warrants will violate it. *Mohawk*, in other words, was much more like an everyday civil discovery dispute than *Perlman* – or this case, which is squarely controlled by *Perlman*.

> even cite *Perlman,* a fact that is not that
> surprising given that the *Perlman* doctrine and
> the collateral order doctrine recognize separate
> exceptions to the general rule of finality under
> § 1291.

*In re Grand Jury*, 705 F.3d at 146.  Importantly, the government itself

recognizes that the *Perlman* doctrine and the collateral order doctrine

are distinct, and it addresses them entirely separately.  *See* Opp.

¶¶ 11-17 (separate "Applicable Law" for each); *id.* ¶¶ 20-23 (arguing

"The Order is Not Appealable Under the Collateral Order Doctrine"); *id.*

¶¶ 23-24 (arguing "The Order is Not Appealable Under the *Perlman*

Doctrine"); *see also United States v. Krane*, 625 F.3d 568, 572 (9th Cir.

2010) ("*Perlman* and *Mohawk* are not in tension.  When assessing the

jurisdictional basis for an interlocutory appeal, we have considered the

*Perlman* rule and the *Cohen* collateral order exception separately, as

distinct doctrines.").

   Additionally, *Mohawk* focused "exclusively on the third

requirement of the collateral order doctrine," *In re Grand Jury*, 705

F.3d at 145, holding that "collateral order appeals are not necessary to

ensure effective review of orders adverse to the attorney-client

privilege" because "postjudgment appeals generally suffice to protect

the rights of litigants and assure the vitality of the attorney-client privilege." *Mohawk,* 558 U.S. at 108-09. *Mohawk* held that "[a]ppellate courts can remedy the improper disclosure of privileged material in the same way they remedy a host of other erroneous evidentiary rulings: by vacating an adverse judgment and remanding for a new trial in which the protected material and its fruits are excluded from evidence." *Id.* at 109. But for the reasons stated above, Mr. Archer's concerns are not limited to the government's admission of privileged materials at trial.

Instead, Mr. Archer's primary concerns revolve around the fact that the government's review of the thousands of privileged documents stored in the Google and Apptix accounts will both destroy the privilege and change the tenor and/or direction of the government's investigation in ways that neither he nor anyone outside of the prosecution team can know or understand, and in ways that could not be easily remedied after the fact.

As noted above, this concern is particularly acute given the government's explicit acknowledgment that it intends to "tak[e] further investigative steps based on information gleaned from the fruits" of the warrants. Opp. ¶ 43. As this Court held in *U.S. v. Lavender*, 583 F.2d

630, 632 (2d Cir. 1978), in the Fifth Amendment context, there is

"a conceivable danger that appellate review following a subsequent

conviction will not adequately preserve" Mr. Archer's rights:

> Where a claim of privilege is involved appellate
> courts cannot always repair the error once the cat
> is out of the bag.  If forced to rely on motions at
> trial or on post-trial review for vindication of his
> rights . . . , the individual who unsuccessfully
> challenges a subpoena directed to a third party
> may be compelled to surrender the very
> protection which the privilege is designed to
> guarantee.

*Id.* at 632-33 (quotations omitted).

Accordingly, not only has *Mohawk* not undercut the continued

validity and necessity of the *Perlman* doctrine, but this case also does

not present the kind of issues presented by *Mohawk*, as the Order on

appeal "involves an asserted right the legal and practical value of which

would be destroyed if it were not vindicated before trial."  *Lauro Lines*

*s.r.l. v. Chasser*, 490 U.S. 495, 498-99 (1989).

## B.  This Court Has Jurisdiction Over This Appeal Pursuant To 28 U.S.C. § 1292(a)(1)

This Court also has jurisdiction pursuant to 28 U.S.C.

§ 1292(a)(1), as the District Court's Order, by its own terms, amounted

to a denial of injunctive relief.

The government's sole argument against jurisdiction under section 1292(a)(1) is a citation to *United States v. Pappas*, 94 F.3d 795, 798 (2d Cir. 1996), where this Court stated that "[p]rotective orders that only regulate materials exchanged between the parties incident to litigation . . . are not . . . injunctions appealable under 28 U.S.C. § 1292." But this citation is misleading, and the government's broader argument is incorrect.

*Pappas* has little to do with the jurisdictional issues presented here. The defendant in that case wished to make public disclosures of confidential information, and this Court found that he could not appeal a protective order prohibiting his dissemination of such information, which was acquired in the course of litigation. In other words, *Pappas* merely ruled that a routine protective order concerning "materials exchanged in the course of litigation" was not appealable. *Id.* at 798. Notably, however, the *Pappas* opinion also held that an order concerning other information *was* appealable. *Id.* at 798-802. Thus, *Pappas* supports the appealability of a district court order that "is not a typical protective order regulating discovery documents." *Id.*

In contrast to the protective order in *Pappas*, the relief that

Mr. Archer seeks – staying the execution of the Google warrant and

enjoining the government from reviewing the fruits of the Apptix

warrant pending adjudication of a motion to quash – is in the nature of

injunctive relief.  Section 1292(a)(1) expressly grants this Court

jurisdiction to hear appeals of interlocutory orders granting or refusing

to grant injunctions such as the ones that Mr. Archer asked the District

Court to enter.  *See* 28 U.S.C. § 1292(a)(1); *see also HBE Leasing Corp.

v. Frank*, 48 F.3d 623, 632 (2d Cir. 1999); *Nat'l Equipment Rental, Ltd.

v. Fowler*, 287 F.2d 43, 45 (2d Cir. 1961).  This is an express, statutory

exception to the final judgment rule.  *See United States v. Philip Morris

USA Inc.*, 686 F.3d 839, 844 (D.C. Cir. 2012); *Gold v. Lomenzo*, 425 F.2d

959, 961 n.2 (2d Cir. 1970).

Moreover, there is no support for imposing special limitations on

section 1292(a)(1) jurisdiction that are not present in the statute.  *See,

e.g., Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 254 (1992) (refusing to

impose an extra-textual limit to § 1292 jurisdiction, noting that

Congress had not "indicated that the unadorned words of § 1292 are in

some way limited by implication").  And, contrary to the government's

argument before the District Court – which, like its argument that pre-execution motions to quash search warrants are unprecedented, it appears to have abandoned on appeal – the Courts of Appeals have premised jurisdiction over interlocutory appeals in criminal cases on section 1292(a)(1). *See, e.g., United States v. Monsanto,* 491 U.S. 600, 602-06 (1989); *United States v. Kaley*, 579 F.3d 1246, 1252 (11th Cir. 2009); *United States v. McVeigh*, 157 F.3d 809, 811, 813 (10th Cir. 1998); *United States v. Kirschenbaum*, 156 F.3d 784, 788 (7th Cir. 1998); *United States v. Ripinsky*, 20 F.3d 359 (9th Cir. 1994); *United States v. Jenkins*, 974 F.2d 32, 34 (5th Cir. 1992); *see also* 15B Wright and Miller, Federal Practice and Procedure § 3918 ("Section 1292(a)(1) should be available as an alternative to manipulation of finality concepts [under section 1291] in the rare instances in which a genuinely injunctive order is entered in a criminal proceeding. *The most likely candidates for appeal will be orders directed to nonparties.*") (emphasis added); *compare* 28 U.S.C. § 1292(b) (specifying, unlike section 1292(a)(1), that it applies only to orders "in a civil action").

Additionally, even where an order does not deny injunctive relief on its face, the Supreme Court has still ruled that jurisdiction pursuant

to section 1292(a)(1) is available where an order (1) has the "practical effect of refusing an injunction," and (2) will have serious, potentially irreparable, consequences that can only be effectively challenged by immediate appeal. *Carson v. American Brands, Inc.*, 450 U.S. 79, 84 (1981); *see also Zervos v. Verizon N.Y., Inc.*, 277 F.3d 635, 645 (2d Cir. 2002).

Even if the District Court's Order is not injunctive on its face, this appeal clears both hurdles under *Carson* because the Order is at least effectively injunctive, *see* Ex. B, at 5 ("You are asking for something akin to a stay. . . . That's really what you are asking for."), and for the reasons discussed above, Mr. Archer will be immediately and irreparably harmed absent this appeal. Courts have therefore found that injunctions prohibiting the execution of warrants or subpoenas may be appealed pursuant to section 1292(a)(1). *See, e.g., West Point-Pepperell, Inc. v. Donovan*, 689 F.2d 950, 953 (11th Cir. 1982) (injunction against OSHA inspection warrant); *Google, Inc. v. Hood*, 822 F.3d 212, 216 (5th Cir. 2016) (injunction against state law administrative subpoena). Indeed, the government's position here is in tension with its invocation of appellate jurisdiction in cases such as

*West Point-Pepperell*, where the United States filed an interlocutory

appeal under section 1292(a)(1) in response to the "grant of a

preliminary injunction by the district court staying the execution of an

OSHA inspection warrant issued by a duly authorized magistrate." 689

F.2d at 952-53.

Accordingly, this Court has jurisdiction pursuant section

1292(a)(1).

## C. If Jurisdiction Is Not Proper Pursuant To 28 U.S.C. §§ 1291 or 1292(a)(1), This Court Should Issue A Writ Of Mandamus

If this Court determines that it does not have jurisdiction over this

appeal pursuant to either 28 U.S.C. §§ 1291 or 1292(a)(1), then it

should nonetheless reach the merits of Mr. Archer's arguments by

granting his petition for a writ of mandamus, which is substantively

addressed immediately below.

## III. Mr. Archer's Petition For A Writ Of Mandamus Should Be Granted

Each of the requirements for a writ of mandamus is present here.

Absent jurisdiction pursuant to 28 U.S.C. §§ 1291 or 1292(a)(1),

Mr. Archer will have no other means for attaining the relief to which he

is entitled; the novelty of Mr. Archer's claim makes the writ particularly

appropriate; and Mr. Archer will be able to demonstrate his clear right to the writ.

The government's sole contention against mandamus is that, in its estimation, Mr. Archer has other adequate means to attain the relief he desires because "[t]he district courts are fully equipped to, and regularly do, confront and decide exactly the kinds of claims for which Archer is now seeking a writ of mandamus." Opp. ¶ 45. But this argument again misses the point.

Mandamus jurisdiction exists to remedy errors in the District Court when other means of jurisdiction may be unavailable. *See generally In re the City of New York*, 607 F.3d 923 (2d Cir. 2010) (granting mandamus jurisdiction for challenge of a discovery order based on alleged "law enforcement privilege"). The relevant issue is whether the District Court abused its discretion to Mr. Archer's detriment, in a situation in which he is left with no other means to obtain the relief to which he is entitled. *See In re von Bulow*, 828 F.2d 94, 97 (2d Cir. 1987) ("when a discovery question is of extraordinary significance or there is extreme need for reversal of the district court's mandate before the case goes to judgment, the writ of mandamus

provides an escape hatch for the finality rule").

As discussed above, Mr. Archer's attorney-client privilege will be invaded as soon as the government begins to review the materials sought by the warrants. Despite his ability to move to suppress the government's use of privileged or otherwise improperly-obtained materials at trial, it will be impossible for Mr. Archer to know whether and precisely which aspects of the government's subsequent investigation in this case will be based on the fruits of the search of the thousands of privileged documents in the subject accounts. Interference with Mr. Archer's privilege well before trial can represent a serious violation that is not easily remedied, or that cannot be remedied at all. *See, e.g., United States v. Neill*, 952 F. Supp. 834, 839 (D.D.C. 1997) ("the right to a fair trial could be crippled by government interference with the attorney-client privilege long before the formal commencement of a criminal proceeding").

This Court has found that mandamus jurisdiction is particularly appropriate where serious privacy or privilege concerns of a criminal defendant are at issue. In *SEC v. Rajaratnam*, 622 F.3d 159 (2d Cir. 2010), the defendant in an SEC civil case was also charged criminally.

As part of criminal discovery, the government disclosed numerous wiretaps, which the SEC then demanded in civil discovery. The district court ordered disclosure, and the defendant immediately appealed. This Court, in granting mandamus, recognized that the privacy rights at issue could not be remedied on final appeal. *Id.* at 164.

As discussed above and in Mr. Archer's motion for a stay pending appeal, the warrants at issue here seek all emails for a nearly two-and-a-half-year period from two separate accounts, in addition to the entire contents of Google Drive, Picasa Web Album, all internet browsing activity, and other information having nothing to do with the crimes charged in this action. As in *Rajaratnam*, the information the government seeks via these two warrants is wildly overbroad, and will affect the privacy interests not only of Mr. Archer, but also of numerous other individuals and entities who are not alleged to have had anything to do with the underlying charges. As this Court noted in *Rajaratnam*, "the harm to this interest is compounded by the fact that the ordered disclosure affects the rights of numerous innocent parties, who will have even their irrelevant conversations disclosed." *Id.* at 170.

Similarly, this Court granted mandamus to hear an appeal based

on a claim of privilege in *In re City of New York*, 607 F.3d 923 (2d Cir. 2010). In that case, class action plaintiffs demanded sensitive intelligence reports prepared by undercover police officers, which the city contended were protected by a "law enforcement privilege." *Id*. at 936. In addition to finding that jurisdiction was available for mandamus relief, this Court found that inadvertent disclosure of the purportedly privileged information could not be remedied later, as "the police may never know if their undercover operations have been compromised by an unauthorized disclosure of that information." *Id.* Mr. Archer's appeal presents a similar concern: While the government's use of a privileged document as an exhibit at trial will be easy to see, it will be much more difficult – perhaps impossible – for Mr. Archer to determine whether later investigative actions or evidentiary determinations were a result of the government's review of one or several of the thousands of privileged communications in the subject accounts.

The novelty of this appeal also makes mandamus appropriate. While the government argues that this case is not "novel" because district courts routinely deal with suppression issues, *see* Opp. ¶ 45, this

argument misses the point. As the District Court stated even as it was denying Mr. Archer's motion:

> I would describe [the motion] as novel. . . . I don't mean to discount the novelty or complexity of some of the constitutional issues that may be raised by warrants involving electronic data. It's clear from the Second Circuit's recent en banc decision in Ganais that we are only beginning to grapple with some of these issues.

Ex. B, at 17-18. The District Court also recognized that this "novel" situation is likely to "come up more and more." *Id*. at 18.[11] But the District Court felt uncomfortable entertaining Mr. Archer's motion because, in its view (mistaken, as the government now concedes), the situation was unprecedented. Mandamus is therefore appropriate, as this Court's decision will "offer useful guidance to the district courts" as technological developments continue to create new legal questions. *U.S. v. Prevezon Holdings Ltd*., 839 F.3d 227, 237 (2d Cir. 2016).

Finally, for the reasons stated above and in Mr. Archer's

---

[11]     The government's argument that this appeal does not raise a "novel" question, Opp. ¶ 45, is also belied by its own (incorrect) argument about the availability of a motion to quash, which the government says is not controlled by any "statutory requirement, nor other legal precedent." *Id*. ¶ 29.

motion for a stay pending appeal, Mr. Archer is likely to prevail in his appeal and demonstrate a clear and indisputable right to the writ.

## CONCLUSION

Mr. Archer's motion for a stay pending appeal and petition for a writ of mandamus should be granted, and the government's motion to dismiss should be denied.

Dated: February 17, 2017
      New York, New York

                                 Respectfully submitted,

                                 BOIES SCHILLER FLEXNER LLP
                                 *Attorneys for Devon Archer*

                                 /s/ Matthew L. Schwartz
                                 Matthew L. Schwartz
                                 575 Lexington Avenue
                                 New York, New York 10022
                                 Tel.: (212) 446-2300
                                 Email: mlschwartz@bsfllp.com

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned counsel hereby certifies that, simultaneously with this combined reply and opposition, Mr. Archer is filing a motion for permission to file an oversized brief not to exceed 8,500 words. As measured by the word processing system used to prepare this combined reply and opposition, there are 8,454 words herein.

Matthew L. Schwartz
*Attorney for Devon Archer*